The next case is Encore Wire v. Southwire, 15-1249. In this case, for the benefit of the audience, involves the same claim, same claims, same patent. And some of the claims that the Patent Office found anticipated earlier, here they find a reversed examiner and found them to be non-obvious. We'll leave it to Mr. Ciccarelli to elucidate the case. Thank you, Your Honor. My name is Max Ciccarelli and I will be presenting for Encore Wire Corporation, the appellant in this case. The Board made a legal conclusion down below regarding the four claims that have a 9% or greater concentration limitation. And what the Board concluded was that those claims were not obvious. Its reasoning or reason for doing that, however, was that the range in the claim, greater than 9%, did not overlap the range in the prior article, which was 1-5%. That's where it got it wrong. Because that reasoning is contrary to at least five Federal Circuit or CCPA cases that we cited in Claim 25-0 opening brief. This is very bizarre to have, isn't it? The same Patent Office examined in two different re-examinations the exact same patent, the exact same claims. And in one instance, they find they're all anticipated. In another instance, the same office finds they're not obvious. It just feels wrong to me. It feels like there's a possible inconsistency in this. I've had people make that argument. It was different examiners. I think the reason is the prior art that was relied upon by the parties in the two re-examinations was different. But MEDA was on the front face of the patent, so it was always available as part of the prosecution, both original and re-examined. It was, but Encore Wire chose to rely on different references because we thought it put on a different case. Whenever you have ongoing, simultaneous re-examinations, we don't want to make the same arguments. We want to present different arguments, so we relied on other references. Not so good ones. Not nearly as good ones, right? Well, let's talk about that. Let's talk about that. They won, and you didn't. The same exact examiners. The examiner rejected all our claims. The board made the error. The legal error of saying, because the ranges don't overlap, it's not obvious, and that's where it's wrong. The five cases that we cited on page 25 of the Encore opening brief. I'm familiar with one of them. Which one? The one I wrote. I mean, isn't criticality an important consideration under these circumstances? Yes, so criticality is a way that Southwire would try to overcome a pre-promulgation case of obviousness. The issue with criticality is that they have to point to an unexpected result that is different in kind, not in degree. And all that Southwire has tried to show is that the amount of lubricity, the amount of slip, might not be predictable. Even if you spot them that argument, which I don't, and we can talk about that. Even if you spot them that argument, as best that difference is one of degree. Because they're saying that it wasn't predictable that it might go up or down a little bit. That's just a matter of degree, it's not a matter of kind. For example, if they had discovered that 9%, instead of making it more slick, made it stiffer, or made it fire retardant, now we're talking about a difference in kind. Those are the differences, the only types of differences, that can overcome a pre-promulgation case of obviousness. As the Galderma case, for example, pointed out, unexpected results that are prototype of non-obviousness are those that are different in kind and not merely in degree from the results of the prior art. We also have Galderma saying that results which differ by percentages are differences in degree rather than kind. And let's remember, Southwire has not even argued or debated or responded to our argument in the briefs that they have not shown a difference in kind. They have not responded to that or argued it, because they cannot say that. Now, with respect to whether it is even an unexpected difference, I would bet the difference, because what they rely on to make that point, is the patent. They go to the figure of the patent. They're not looking at what the prior art teaches. And it's what the prior art teaches that matters. And when you look at the DAS warning figure 2, for example, it shows you a graph, and it shows you a relationship, it shows you nothing unexpected. So, I don't even think it's an unexpected difference. But if you accept their argument that it is unexpected, even then it's not the right kind of difference, because it's just a difference in degree, not in kind. They also, I'd like to go back, if possible, if that answers your question in that regard. You can presume it was answered if you don't get a follow-up. Going back to the ranges being non-overlapping, those five cases all deal with a situation where the ranges were not overlapping. And the court found the claims obvious. The thread that runs through those cases are two fact findings. The first fact finding is that the limitations of the claim are generally shown in the prior art. The second fact finding is that the missing limitation is of a type that would yield predictable results. And once you have those two fact findings, those five cases set in whole, that you have a pretty much spatial case of obviousness. Now, what did the board do here? It made those two fact findings. It found that the only element from the claims that was not expressly identified in the prior art was the 9% limitation. That was the first fact finding on pages 12 and 13 of the appendix. The other fact finding was that the prior art taught that adding lubricant to this nylon sheet yielded predictable results. That's the second finding that's on page 8. Once it made those two rulings... Why is the board incorrect, or why should we conclude the fact finding is not supported by substantial evidence, when the board said it wouldn't have been obvious to extrapolate the curve in Figure 2 to values over 9%, and when the art actually does expressly show diminishing returns at anything greater than 5%, which would have, I think, discouraged a skilled artisan from going over 5%. What's the point? You get diminishing returns. So, why aren't those fact findings supported by substantial evidence? So, I don't know that that's really a fact finding because it's really talking about obviousness. It's really ruling on the obviousness issue, which I think is trying to interpret the facts. And talking about obviousness of... Well, certainly, whether or not there are diminishing returns after 5% is a fact finding, right? How could it not be? Whether or not lubricating at greater than 5% has diminishing returns? How can that not be a fact finding? It could be. That part of it could be. Going out on a limb there. So, if we look in the Galderma case, right, even if you have a situation where you would expect something and that something doesn't occur, and it's still talking about the degree and not the time, that doesn't help you get there. So, even if we take that quote-unquote fact finding on its face, it still relates to the amount of lubricity and whether it would have been obvious to go to a particular percentage because of some expected result. It doesn't matter if that expected result is there or not if you're talking about the amount of lubricity. I have to admit, I don't fully follow you. I follow you. The claims require 9% or more, and if the ART suggests not really worth going above 5% because you don't get any benefit or bang for your buck above 5%, why are the claims nonetheless obvious to go to 9% or more? Okay. So, thank you. You have to look at the application that each reference or patent is talking about. In the Dow Chemical, Dow Corning, it was looking at a particular application, a particular goal it was trying to achieve. For that goal, 1% to 5% was the concentration that they thought was better. The inventors in this patent were trying to achieve a different goal. Again, the general goal of getting it to be slicker is the same, but the specific application is different. So, the inventors here were trying to address the gentleman, the wire installer at the job site that is slogging this grease on the cable, right? And they're trying to solve that problem. And for that particular problem, they found that 9% was better. What's important is that the general concept that adding lubricant makes it more slick is there, and it's the same in both situations. You have to look at the application, and whatever the application may be, you run a test to determine what the best value is. That's exactly what we're talking about here, what those five lines of cases say, is that when finding the optimum amount, it's just a matter of running a test, that's not inventive activity. It cannot be inventive activity. If the prior art recognizes the relationship between, in this case, adding lubricant and getting a slippier cable, the rest is just a test. That's not inventive. That's specifically what those five cases say. So that's why it doesn't matter that the prior art, the DAP corning, only goes up to 5%. It was trying to optimize it in a different way. The inventors are trying to optimize the same characteristics in a different way. That's why they get to a different number. But that's not enough. That's a difference in degree, not a difference in time. That's the kind of unexpected result that you would need in order to have that situation be non-obvious and be patentable. And that's why I think those cases are particularly helpful, because they have exactly the same situation. When the prior art talks about one range, the invention talks about a different range. But the Federal Circuit said, the panel said, it doesn't matter. What matters are the underlying fact findings. Does the prior art generally show the limitations of the claims? Yes. And with respect to the missing element, is that element the type that yields predictable results? The board found below that it does, in fact, yield predictable results. That's on page 8 of the record. Having made those findings, we have a compensation case, and now the only way to get out of that is to show a critical element. And yes, South Park will stand up here and try to argue that it's critical. But let's remind them when they try to do that that they have to show a difference in time, not a difference in degree. And whether adding 5% makes it a little bit slick or a little more slick than adding 6.5% is irrelevant. Chickarelli, you wanted to say five minutes. You can continue. Thank you, Your Honor. Mr. Bradley, welcome back. Thank you, Your Honor. It's been too long. May it please the Court that the premise of what Mr. Bradley Mr. Bradley, we can hear you. I apologize. I know. Adrenaline. I know. The premise that Encore raises is that we must show a difference in degree and not time. That premise isn't right. The case law makes clear. No, their premise is the opposite. You have to show a difference in kind, not degree. We're just not trying to show that there was. They have the law correct on that aspect, but we're not trying to show here that there's a difference in time. The law in Applied Materials says that, quote, evidence that the variables interacted in an unpredictable and unexpected way could render the combination non-obvious. And that's what we've shown in our briefs. What did you show about it being unpredictable or unusual? We showed first that, as Your Honor noted, this is a fact finding that the Board made that it's not appropriate to exacerbate the curve of doubt beyond 5%. No, I think precisely what the Board found was, and correct me, because I may be wrong about the record, but I think precisely what they found was there are diminishing returns above 5%. It doesn't mean there still aren't returns. My 14-year-old came home the other day with a 97 in math, and I was talking to him about the question he got wrong, and it was a proof in geometry that took a friend of mine who was an electrical engineer roughly an hour to help him solve. I was completely useless. And anyway, there was talk about the quiz afterwards, and Billy said, Mom, I got a 97. 97 is actually still an A+. For me to have gotten 100 would have taken me like 10 more hours of studying. Okay? So it doesn't mean he couldn't have gotten a better grade. It just means there were diminishing returns in his mind of spending all that additional time studying. So why isn't that kind of like the Board's fact-finding here? What they didn't say was the art would discourage someone. No one would go above 5%. They said there would be diminishing returns above 5%. They didn't say there wouldn't be returns. They would just be diminishing. So if someone was looking to optimize, they would stick at the 5% range, but if they wanted more lubrication, they would go above. Why isn't that the way I should understand the Board's fact-finding? Our argument was that the curve in Dow appeared to show diminishing returns when you get down to 5%. The point is we don't know what's going to happen after that. The Board did not find what might happen after that. They did not find that there's diminishing returns. What they found, as a factual matter, is that it would not have been obvious, quote, to extrapolate the curve shown in Figure 2 of Dow to values over 9%. They said it's not appropriate to extrapolate that curve. The point being we don't know what's going to happen after that. And if you look at Figure 3 of Southwire's patent, and as Encore acknowledged in their brief, the data are varied. In our Figure 3, the data is going down, and at 6.5%, the data jumps back up unexpectedly. Mr. Bradley, if we agree with your opponent here and find the claims to have been obvious, and we're, of course, talking about past, is the first appeal moot? No, Your Honor, because this proceeding involved fewer than all of the claims. The prior case involved all 15 claims, and this one involves a subset. There's several independent and defendant claims missing. So no, Your Honor, it's not moot. And the reverse. If we don't agree with you on the first case, is this moot? If all of the claims are anticipated in the first case, which is absolutely wrong, this case would be moot. So speaking of things that PTAP did or didn't do, how do you deal with their failure to discuss 6, 7, 11, and 12 in light of French 364 and W0653? How do we have any basis to review? You want to translate that for the law students? I mean, that was a bunch of gibberish and acronyms. Poor law students don't have any basis. But prior references. I apologize for the question. Those were not presented for appeal to this Board. The Board was never asked to address those references. When Encore got the initial ruling, which addressed only Chuba, Brown, and Dow, Encore revisited to the Board and said, well, what about these other Browns? And some of them involved the FR reference, the WO reference, and JP601. And what Encore asked the Board to do was say, we have these other references. You need to reconsider these four or five Browns that involved the JP601 reference. They did not press to the Board that they needed to do anything further on the FR or WO reference. And what happened was the Board came back on rehearing and said, okay, we reviewed the JP601 reference, and it doesn't say what you, Encore, think it says. And so we're not doing anything further with that. And Encore chose not to appeal anything as to the JP601 reference. And the combination they're now mentioning in their brief, and they're suggesting that a remand is appropriate, is a combination that involves JP601. But they already lost on that point. And they didn't appeal it. There's nothing further to be decided. So when this case is affirmed, based on the fact-finding and the substantial evidence that supports the Board's ruling, there should be no remand because there's nothing left to be decided. If this Court remanded, the Board would just repeat, we already told you JP601 is irrelevant. The combination they're pressing that involves FR and WO also includes JP601. There's nothing more to be done. And we would be coming up to this Court and we would argue that they had waived that because they should have presented any concerns they had about the findings on JP601. They should have done that right now. Now, we don't even have to get to the issue of result-affected variable. Of course, we argue that the Board's fact-finding that you can't extrapolate the data, that is supported by substantial evidence. But that only affects the narrower claims that involve at least 9%. As to the other claims, the broader claims, our prosecutorial showed why the Board erred in that regard, and they did. The Board failed to even consider our evidence that Brown teaches away. There's no way a person of skill in the arts, 10 or so years ago, with Chuba, which talks about polyethylene fiddles and only mentions THHN in the background and doesn't address it at all, there's no way to combine that with Brown. When Brown focuses on polyethylene terephthalate fiddles, it only mentions nylon once. And when it mentions nylon, it says it has intrinsically... Did the Board make a fact-finding about your teaching away argument? The Board did not address it at all. There's no mention of it at all. And the Board, in fact, when it quoted from Brown, it quoted the part just shy of the part that we highlight, and we highlighted in our field research report, saying that when Brown talks about nylon, it teaches. The only thing it says about nylon is that it has intrinsically better friction properties than other polymers, and therefore may not be necessary to add any friction agents at all. The only thing it says about nylon is that. You mentioned that Chuba sort of sloughs off the THHN disclosure, but it's there. Oh, it's there, but it doesn't teach anything. If a person of skill in the arts at the time had Chuba, which mentions THHN exists, there's no question about that, and then spends its entire disclosure talking about something else. And then combine that with Brown, which the only thing it says about that's relevant here is that nylon intrinsically has good anti-friction properties and doesn't need any lubrication. There's no basis for combining those two. Nobody of skill in the arts would sit there with Chuba and Brown and say, Oh, I see here that THHN cable with a nylon outer sheet needs improved friction properties for pulling through building installations. It's not what those teach to a person of skill in the arts. The only way you get there is by doing what the board appeared to have done, which is take our claims as a blueprint, find the words, and then go try to find disparate references taken out of context, not for their full value, for example, Brown, and stitch back together and call that obvious. That kind of hindsight reconstruction is improper. Let me take you back to my gibberish question. The PTAB itself notes that 6, 7, 11, and 12 were rejected by the examiner over each of FR364 and W0653 in combination with the other references which are discussed. They don't discuss those two references either in the decision on appeal or in the request for rehearing. How can we review it? There is no need for a review. This court should not review it. Also, the point in our brief was there should be no romantic overview because Encore never pointed to those references as doing anything special. The combination that they point to has those references and also has that JP601 and the board found against them on that. The examiner, on the other hand, does say there's something special about those references. But the board found that JP601 is not relevant and Encore did not appeal that. There's no reason to go back and look at a combination that involves JP601 and a couple other references if the reason they were citing the JP reference didn't materialize. It was ruled against them on that and they did not appeal it. They could have come to this court and said they got the issue on JP601. They got that wrong and here's why. But they didn't. There's no reason to send it back. And the fact that there's two other references in that combination that includes JP doesn't change that. They lost on JP. That's enough. And they didn't appeal it. I'd like to reserve the rest of my time unless there's further questions. All right. So what you're reserving is time for a cross-appeal if there was something to rebut. Understood. Thank you. We'll see if there is. First of all, Your Honor, I wish my kids would get 97s in math. I didn't tell you about his biology grades. You're putting this on the record. I want to first go back to the questions you asked me about the board saying it would have been obvious to extrapolate. And kind of what I didn't explain very well what I was trying to say. Now that I've formulated some thoughts, I wanted to address that briefly. When the board is saying it would have been obvious to extrapolate, it's looking at facts. It's looking at the range that shows the prior art and it's talking about whether it's obvious to extrapolate it out. That is a legal conclusion and it runs in the face of those other cases which say that if you have that situation where that element or that limitation is one that yields predictable results, you don't need overlapping ranges. So you don't need to extrapolate them out. You don't need to get to that legal conclusion where it would have been obvious to do that. So that's what I was trying to say and I was trying to clarify it a little bit, if I did. With respect to the French and the W.O. references, Salfar is trying to lump in our arguments with respect to those two references into the J.P. 601. When we asked for the re-hearing, we used the 601 as an example to show the board that they had not looked at the various grounds, four of the grounds. The board chose to address ground three but didn't say anything about the others. It's not that we didn't ask them to. We certainly did. They just didn't do it. And as you pointed out, Your Honor, they didn't mention those two references, the French and the W.O. references at all. So we don't know what fact findings there are with respect to that. But if each of the rejections, and I don't know this record so you'll certainly clear it up for me, I'm sure. But if each of the rejections, as the opposing counsel suggested, relied on a reference that the board found was expressly not relevant, and you didn't appeal that, then why are they really at fault for not having gotten more precise in analyzing the other prior art references, which in combination with the one they said is out of here? I don't understand. His argument sounds pretty good. The factual question that would have to be determined that we are not able to do here is whether, in fact, the board thought that the F.R., the French, and the W.O. references taught the same thing as the J.P. reference. And as Judge Will pointed out, the examiner thought that they were different in some respects. And it's those differences that we're entitled to get a ruling on. The F.R. and W.O. references very well may teach the same things that the J.P. reference taught. So we need the board to tell us, look, for the same reason that J.P. was not sufficient, I find that the F.R. reference is also missing that and the W.O. reference is missing that. But we don't have that analysis or that finding or that discussion for that matter. With respect to teaching away, I think that's a red-headed, red herring argument. Red-headed herring. Because Brown says it may not be necessary to lubricate the nylon. Brown is saying that, look, you can add lubricants to the outer sheet to make it more slick. That's there. One of the possible outer sheets is nylon. So Brown is saying that you can add lubricants to nylon to make it more slick. It so happens that in its specific application, which was optical cable that had to be stiffer so you could push it down underneath the city, nylon was slick enough. That wasn't their concern. Their concern was, I need to make it stiffer so I can look at other things and network around the stuff. So Brown actually does say that adding lubricants makes it more slick. So the fact that Brown says that it may not be necessary to add lubricants to nylon implicitly says, in some situations, it may be. You just have to test for it and see what optimal characteristics you want to achieve. So I think that's the red herring. And then in terms of stitching together the references, if you look at the problem being solved, it was to make nylon coated cable more slick. Dow teaches you how to make nylon more slick. You don't need anything else to motivate you to combine. Thank you, Mr. Ciccarelli. Mr. Brown, Ms. Bradley, did you hear something that you need to respond to in relation to the subject matter of the cross-appeal? There is, Your Honor. Counsel for Encore just mentioned that the problem to be solved was how to make nylon more slick. That was not the problem to be solved. The art had been using, for decades, perfectly slick nylons. They had been externally lubricating them. The invention was recognizing a way, contrary to the decades-old process, to get rid of the mess and the time and the expense and labor of doing it that way. Software came up with a way to internally lubricate these so that when the cables are pulled in the building passageway, the lubricant permeates the sheet and appears in order to be able to pull the cables. It was a revolutionary process. And so the problem to be solved was not simply how to make cables slicker. It was how to do it in an entirely different way than was in the prior art. And the combination that the board relied upon does not even recognize that problem, much less solve it. The Brown reference discourages a person of skill in the art from looking to improve the friction characteristics of nylon. And discouraging is teaching away. And if you have teaching away evidence, the way you do a proper obviousness analysis is to consider all of the record. Not just pick the parts that support the conclusion the board was trying to reach. You have to look at all of it. And the board did not address the teaching away argument that would have discouraged a person of skill in the art from relying upon Brown for improving friction properties. The only time it talked about nylon, it said the opposite. It said nylon is intrinsically good for antifriction. It may not need lubricant. None of the references identified the problem that Southwire solved. None of the references disclosed that nylon sheet THHN cables need any friction related improvements. None of the references addressed a pulling force, having a pulling lubricant that would permeate the sheet. The combination is a hindsight view as improper. What's your question? Thank you Mr. Bradley. We'll take tapes and revise them.